UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 6/28/13

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHRISTOPHER G. DIPALMA,                          :

             Plaintiff,                          :          12 Civ. 6708 (AJP)

    -against-                                        :          **OPINION & ORDER**

CAROLYN W. COLVIN, Commissioner of               :
Social Security,
                       :
            Defendant.
                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

Plaintiff Christopher G. DiPalma, represented by counsel, brings this action pursuant

to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the

Commissioner of Social Security (the "Commissioner") denying him Disability Insurance Benefits

("DIB"). (Dkt. No. 1: Compl.) Presently before the Court are the parties' cross-motions for

judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. Nos. 14, 17 & 19: Notices of

Motion.) The parties have consented to decision by a Magistrate Judge pursuant to 28 U.S.C. §

636(c). (Dkt. No. 24.)

For the reasons set forth below, the Commissioner's cross-motion for judgment on

the pleadings (Dkt. No. 17) is GRANTED, and DiPalma's motion (Dkt. Nos. 14 & 19) is DENIED.

## FACTS

### Procedural Background

On November 15, 2008, DiPalma applied for DIB, alleging that he was disabled since

January 6, 2003. (Dkt. No. 9: Administrative Record filed by the Comm'r ("R.") 93.) In his

application, DiPalma claimed to suffer from a right knee injury and back and neck pain. (R. 32-33,

136-37.) On March 23, 2009, the Social Security Administration ("SSA") found that DiPalma was not disabled and denied his claim. (R. 46-50.) On April 25, 2009, DiPalma requested an administrative hearing. (R. 65.)

Administrative Law Judge ("ALJ") Dennis G. Katz conducted a hearing on June 7, 2010 (R. 28-39), at which DiPalma appeared with counsel (R. 28, 30). After the hearing, ALJ Katz directed a post-hearing consultative medical examination. (See R. 19, 169, 448-59.) On July 1, 2010, DiPalma underwent a consultative examination with Dr. Suraj Malhotra. (R. 448-59.) On August 24, 2010, ALJ Katz issued a written decision finding that DiPalma was not disabled. (R. 9-23.) ALJ Katz's decision became the Commissioner's final decision when the Appeals Council denied DiPalma's request for review on July 12, 2012. (R. 1-4, 7-8.)

The issue before the Court is whether the Commissioner's decision that DiPalma was not disabled between January 6, 2003 and August 24, 2010 is supported by substantial evidence.

## Non-Medical Evidence

DiPalma was born on July 16, 1961 and was forty-one years old at the time of the alleged onset of his disability. (R. 93.) DiPalma obtained a GED degree in 1979. (R. 142.) Between 1991 and 1999, DiPalma held a number of jobs, including bus driver (light exertion) (R. 144, 148-50), nursing assistant (medium exertion) (R. 144, 147-48) and messenger (light exertion) (R. 144, 146-47). Most recently, DiPalma was an ironworker for a construction company from 1999 to 2003. (R. 144-46.) During those four years, DiPalma engaged in exertionally medium to heavy labor, grabbing, handling and grasping large objects for eight hours. (R. 145.) DiPalma lifted heavy iron pieces, ladders and scaffolding, weighing from fifty to 100 pounds, and stood and walked for four hours each per day. (R. 145.)

In January 2003, DiPalma was injured while working as an ironworker when he stepped into a trough during a blackout. (R. 31-32.) DiPalma injured his right knee and developed pain in his neck and back. (R. 31, 359.) DiPalma had two surgeries to repair his knee and five procedures between the surgeries due to various infections. (R. 35-38, 167-68, 173-74.) DiPalma tried unsuccessfully to return to construction work but could not work for more than two hours. (R. 32.) Aside from a Worker's Compensation settlement of $1.2 million, DiPalma does not receive a pension or disability benefits. (R. 31-32.)

DiPalma lives at home with his wife and two of their four children, ages twelve and fourteen. (R. 34-35.) As a house husband, DiPalma makes breakfast and lunch for his wife, picks up his children from school, and prepares dinner for his family in a typical day. (R. 34.) DiPalma experiences pain when he walks and is unable to sit or stand for long. (R. 33-34.) DiPalma can drive for thirty to forty-five minutes at a time. (R. 34.) DiPalma used to take pain medication but stopped because he is a recovering addict. (R. 35.) DiPalma's knee has not improved since the injury; it remains stiff when he sits and he cannot bend it fully. (R. 35-36.)

## Medical Evidence

### January 6, 2003 Through December 31, 2007

#### Treating Physician Dr. Marc Appel

After DiPalma's injury on January 6, 2003, DiPalma underwent a MRI of his right knee, which revealed a tear to the posterior horn of the medial meniscus. (R. 364.) DiPalma began treatment with Dr. Marc Appel, who diagnosed the medial meniscus tear. (R. 296.) After two weeks of physical therapy, Dr. Appel performed arthroscopy on February 20, 2003 and saw DiPalma monthly through November 2003. (R. 296, 289-91, 297-302, 322, 373-74.)

Throughout this period, DiPalma continued to report pain in the right knee and walked with a limp on the right side. (R. 289-91, 297-99, 322.) Nevertheless, DiPalma had no atrophy, effusion or instability of the knee (R. 289-91, 297-98, 322), and his knee had satisfactory alignment (R. 289-91, 322). Dr. Appel prescribed physical therapy and a knee brace, and advised DiPalma to go to the gym. (R. 289-91, 297-99.) On May 12, 2003, DiPalma complained of "stress transfer to the back and to the neck secondary to walking differently." (R. 298.) Believing that these complaints were related to the knee injury, Dr. Appel referred DiPalma to a chiropractor. (R. 298.)

On April 1, 2003, Dr. Appel assessed that DiPalma was not employable. (R. 297.) In May, July, August and November 2003, Dr. Appel indicated that DiPalma could not perform ironwork. (R. 289-90, 298, 322.) On September 26, 2003, Dr. Appel stated that DiPalma could not perform any type of construction work. (R. 291.) On November 4, 2003, Dr. Appel indicated that if DiPalma could not perform his ironwork position in the future, a decision would have to be made about what kind of work DiPalma would eventually be able to perform. (R. 322.)

On January 23, 2004, Dr. Appel reported that DiPalma continued to walk with a limp, had knee pain and "buckling" to his knee; Dr. Appel recommended that DiPalma continue with weight loss, as he had lost thirty pounds in the past few months. (R. 292, 303.) Dr. Appel stated that while it was about a year since DiPalma's surgery, it was "doubtful" that DiPalma would ever be able to work as an ironworker. (R. 292.) On February 20, 2004, Dr. Appel diagnosed medial compartment osteoarthritis and reiterated that DiPalma "cannot do his regular job." (R. 293, 304.) Although total knee replacement was discussed, Dr. Appel opined on March 19, 2004 that DiPalma was not a good candidate for this procedure due to his young age and marked obesity. (R. 295.) Dr. Appel stated that DiPalma was "not employable." (R. 295.) On May 27, 2004, Dr. Appel performed

a high tibial osteotomy. (R. 367-68, 371.) DiPalma subsequently developed a painful infection and had several procedures to drain the surgical wound. (R. 312-13, 315-16, 366, 372, 430.) By July 19, 2004, DiPalma no longer used a wheelchair or walker, and although he used a cane, DiPalma was able to bear weight fully on his right leg. (R. 317-18; see R. 309, 314, 433-34.)

On August 2, 2004, Dr. Appel's inspection of DiPalma's knee revealed no erythema, deformity or drainage, and the wound was clean. (R. 197, 319.) DiPalma had an antalgic gait and reported mild arthralgia.[1] (R. 197.) DiPalma's neurovascular status, palpation, muscle strength, and range of motion all were normal. (R. 197.) Dr. Appel assessed knee pain and chronic osteomyelitis of the lower leg, and recommended progressive weight-bearing and use of a cane. (R. 197.) On December 8, 2004, DiPalma complained of worsening symptoms, but upon physical examination, Dr. Appel found no deformity. (R. 187-88.) On December 9, 2004, Dr. Appel performed surgery to remove hardware from the prior surgery. (R. 376.) Later that month, Dr. Appel reported that DiPalma had stable symptoms and that DiPalma described moderate anthralgia. (R. 283-85, 325, 327, 329.)

Throughout 2005, Dr. Appel stated that DiPalma could not return to work and had a "temporary total disability." (R. 204, 206, 269-70, 276, 278, 339, 341, 345, 351.) Between January and March 2005, however, Dr. Appel consistently noted that DiPalma's symptoms were improving. (R. 201, 272-77, 336, 338, 340, 342, 344.) On March 18, 2005, DiPalma told Dr. Appel that he was improving and that he was going to Mexico. (R. 272, 344.) On April 15, 2005, after returning from Mexico, DiPalma reported worsening symptoms and low back pain. (R. 203, 346.) DiPalma weighed 350 pounds and reported difficulty with daily activities and an inability to sit,

---

[1]    Antalgic refers to "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." Dorland's Illustrated Medical Dictionary at 97 (32d ed. 2012). Arthralgia is "pain in a joint." Id. at 150.

stand or walk for more than ten minutes. (R. 203, 346.) Upon examination of DiPalma's right knee, Dr. Appel noted muscle atrophy of the quadriceps, genu varus, and an antalgic gait. (R. 204.) At DiPalma's June, August, and October 2005 visits, DiPalma had pain medially and laterally upon palpation of his knee. (R. 205-06, 267, 350-51, 353.) On August 22, 2005, Dr. Appel noted that DiPalma would likely require a total knee replacement in the future, after he lost some weight. (R. 351.) On December 12, 2005, DiPalma reported that his symptoms were unchanged, though he also noted that his knee occasionally would buckle. (R. 262, 354.)

On January 30 and March 13, 2006, DiPalma again reported that his symptoms were unchanged, including reports of pain on palpation and knee buckling. (R. 207-08, 260, 356-57, 389.) Throughout 2006, Dr. Appel stated that DiPalma could not return to work and was permanently disabled. (R. 357, 390, 392, 394, 396, 398.) In March 2006, Dr. Appel noted that DiPalma had lost sixty pounds in an effort to alleviate the knee pain and facilitate walking. (R. 207, 258, 389.) On September 25, 2006, DiPalma complained of knee pain but only moderate arthralgias, and his symptoms were stable since his last examination. (R. 209-10.)

In 2007, Dr. Appel stated that DiPalma had a "permanent total disability" and could not "return to work." (R. 211-12, 399, 402, 404.) On June 29, 2007, Dr. Appel noted that DiPalma continued to suffer from chronic osteomyelitis, osteoarthritis of the knee, knee pain, meniscus tear, and internal derangement of the knee. (R. 404.) Dr. Appel also specified that DiPalma had a "permanent total disability, for his previous profession/iron worker." (R. 404.) Dr. Appel recommended delaying a total knee replacement as long as possible because DiPalma was too young and his weight had increased. (R. 404.)

## Worker's Compensation Medical Examination by Dr. Howard Katz, May 2003

On May 15, 2003, orthopedic surgeon Dr. Howard Katz conducted a Worker's Compensation medical examination of DiPalma. (R. 238-40.) DiPalma reported that his knee was improving (R. 239), and the examination showed well-healed arthroscopic portals, slight effusion, and slight tenderness around the portals. (R. 239.) DiPalma's knee was stable and neurovascular examination was intact. (R. 239.) Dr. Katz diagnosed right knee internal derangement and mild cervical and lumbar strain. (R. 239.) Dr. Katz stated that DiPalma had a "temporary marked partial disability," could perform "desk work or sedentary work at this point," and likely could return to his prior work in about four months. (R. 240.) Dr. Katz recommended that DiPalma continue with physical therapy three times a week and be authorized to join a gym. (R. 239.)

## Worker's Compensation Medical Examination by Dr. Paul Jones

Dr. Paul Jones conducted four Worker's Compensation examinations, the first on October 27, 2003. (R. 235-37.) Dr. Jones found no effusion of the knee joint, no ligamentous instability, and no atrophy of the thighs. (R. 236.) DiPalma was able to walk on his heels and toes and squat. (R. 236.) DiPalma weighed 340 pounds. (R. 236.) Dr. Jones assessed likely internal derangement or a re-tear of the meniscus and recommended a MRI. (R. 237.) Dr. Jones believed that DiPalma could work as long as he avoided prolonged weight-bearing, squatting and running. (R. 237.)

On April 26, 2004, Dr. Jones' examination of DiPalma's right knee indicated a palpable spur on the right side and medial joint line tenderness. (R. 232-34.) Dr. Jones assessed a persistent internal derangement of the right knee with degenerative changes. (R. 233.) Dr. Jones again opined that DiPalma could work as long as he avoided prolonged weight bearing, squatting, bending, stairs and ladders. (R. 234.)

On March 21, 2005, Dr. Jones assessed multiple surgical procedures to DiPalma's right knee with a subsequent infection and degenerative changes. (R. 229-31.) Dr. Jones noted that DiPalma could work but had to avoid prolonged weight bearing, squatting, bending, stairs and ladders. (R. 230.) Dr. Jones also assessed partial disability in the moderate to marked range. (R. 230.)

On February 27, 2006, Dr. Jones assessed continued right knee pain following surgery and arthritis. (R. 226-28.) Dr. Jones recommended a trial of Synvisc injections but noted a risk related to DiPalma's history of post-operative infection. (R. 227.) While DiPalma had discussed total knee replacement with Dr. Appel, Dr. Jones agreed that it was not indicated at the time. (R. 226, 228.) Dr. Jones assessed a marked partial disability, and stated that DiPalma could work if he was able to use a cane, had limited weight-bearing, and did not have to run, squat, or climb stairs or ladders. (R. 228.) Dr. Jones also stated that a "permanent partial disability is to be anticipated." (R. 228.)

### After December 31, 2007

#### Treating Physician Dr. Marc Appel

On February 11, August 20, and September 16, 2008, Dr. Appel saw DiPalma for follow up visits. (R. 215-18, 254-55.) DiPalma's symptoms and Dr. Appel's findings remained unchanged. (R. 215-18, 224-25, 254-55.) DiPalma reported a dull ache, pain with stairs and swelling, and moderate arthralgias. (R. 217, 254.) Dr. Appel noted that DiPalma had lost 110 pounds since having abdominal lap band surgery, and now weighed 280 pounds. (R. 215, 217, 254.)

#### Treating Physician Dr. Barry Hyman

Following Dr. Appel's retirement (R. 33), Dr. Barry Hyman saw DiPalma on November 12, 2008 for an initial evaluation of his right knee pain. (R. 220-23, 359-62.) DiPalma,

who walked with a cane (R. 222), complained of neck and low back pain (R. 220) but reported that he walked and weight-lifted for exercise/recreation (R. 221). Dr. Hyman noted that the x-ray confirmed the osteoarthritis diagnosis at the osteotomy sight with moderate joint space narrowing. (R. 444-47.) Although Dr. Hyman reported that DiPalma was able to do a straight leg raise and that there was stability to varus and valgus stress, Dr. Hyman assessed full permanent disability. (R. 222-23.) DiPalma's pain was sharp and persistent (4 out of 10), and increased with standing and sitting for prolonged periods. (R. 444.) Dr. Hyman further noted that DiPalma's symptoms were severe enough to frequently interfere with attention and concentration. (R. 445.) Dr. Hyman also indicated that since January 2003, DiPalma could sit for less than two hours and stand or walk for less than two hours of an eight-hour workday, and would need to walk for ten minutes at a time every forty-five minutes. (R. 446.) Dr. Hyman further stated that DiPalma would need to shift positions from sitting to standing or walking, and "frequently" would need to take unscheduled breaks during the workday. (R. 446.)

## Consultative Physician Dr. Suraj Malhotra

On July 1, 2010, at the ALJ's request, Dr. Suraj Malhotra examined DiPalma. (R. 19, 169, 448-52.) DiPalma reported that he has had intermittent neck pain for fifteen years, intermittent low back pain for ten years, and persistent knee pain as a result of a 2003 injury. (R. 448.) In 2003, DiPalma had meniscus surgery for the right knee, followed by osteotomy which had infection. (R. 448.) In 2006, DiPalma was hospitalized because he had a lap band for obesity surgery. (R. 448.)

Dr. Malhotra noted that DiPalma had a minimal limp on the right side but that he could walk on heels and toes without difficulty. (R. 449.) DiPalma could squat but only three-fourths the distance due to right knee pain. (R. 449.) DiPalma did not require a cane to walk. (R.

454.) DiPalma used no assistive device and needed no help changing for the exam, getting on and off the exam table, and rising from a chair without difficulty. (R. 449.) Dr. Malhotra reported that there was a mild limitation of the right knee up to 135 degrees flexion/extension due to slight pain, while the left knee was in full range, and DiPalma had no muscle atrophy or sensory abnormality. (R. 450.) Dr. Malhotra found no joint effusion, inflammation or instability. (R. 450.) Dr. Malhotra diagnosed obesity, cervical and lumbosacral region pain, and "status post meniscus tear repair surgery of right knee with pain." (R. 450.) Dr. Malhotra found "[m]inimal limitation in bending and squatting" and "[m]ild limitation in bending right knee." (R. 451.) Dr. Malhotra stated that DiPalma was able to lift and carry up to twenty pounds continuously, sit for seven hours for fifteen minutes at a time, stand for one hour for fifteen minutes at a time, and walk for one hour for thirty minutes at a time. (R. 453-54.) Dr. Malhotra indicated that he did not have sufficient information to assess DiPalma's past limitations. (R. 458.)

## ALJ Katz's Decision

On August 24, 2010, ALJ Katz denied DiPalma's DIB application in a written decision. (R. 9-23.) ALJ Katz reviewed DiPalma's claim of disability resulting from his knee injury and back and neck pain, considering both DiPalma's testimony and the medical record. (R. 14-22.)

ALJ Katz found that DiPalma's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but that DiPalma's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the objective medical evidence." (R. 15.) In particular, ALJ Katz pointed out that despite complaining of substantial pain when walking or driving for over forty-five minutes, DiPalma "does not take any medication for relief of pain - which is [a] major inconsistency." (R. 15.) ALJ Katz further noted that:

> Although [DiPalma] did complain of some pain and some "clicking"/giving way of the right knee, [DiPalma] described his pain as being a dull ache with only moderate arthralgias. Physical examinations performed at those times have yielded evidence of diffuse edema, a **slightly** antalgic gait, crepitus, pain to palpation of the medial and lateral joint lines, genu varus and some atrophy of the quadriceps muscle. However, [DiPalma] was consistently found to maintain intact neurological functioning, deep tendon reflexes and muscle strength.

(R. 17.) ALJ Katz also noted that Dr. Appel's opinion that DiPalma cannot return to work because of his permanent total disability is "highly conclusory and does not specifically state just why [DiPalma] could not perform work other than that of an iron worker." (R. 17.) ALJ Katz commented:

> Dr. Appel, of course, is not a vocational expert and is not qualified to give a general opinion as to whether or not [DiPalma] could "return to work" in occupations less stressful. For those reasons, the [ALJ] cannot give significant evidentiary weight to these opinions . . . .

(R. 17-18.) In addition, ALJ Katz discounted Dr. Appel's opinion because it was in the context of DiPalma's Worker's Compensation claim, where disability is defined as being unable to return to past relevant work. (R. 18.)

ALJ Katz noted that Dr. Hyman "observed good strength of the right knee without pain to resistance on flexion or extension." (R. 19.) In evaluating Dr. Hyman's opinion, that DiPalma "is totally disabled and capable only of performing a significantly limited range of exertionally sedentary work," ALJ Katz noted that Dr. Hyman had examined DiPalma on only one occasion in late 2008. (R. 18, 21.) ALJ Katz also opined that Dr. Hyman's conclusion regarding DiPalma's limitations "is not consistent with the rather minimal objective findings noted by him upon physical examination. The opinion of residual functional capacity appears to be based solely upon [DiPalma's] subjective complaints." (R. 21.)

ALJ Katz further noted that Dr. Katz indicated in May 2003 that DiPalma could

return to desk or sedentary work activities. (R. 19.) Dr. Jones, who performed four examinations

of DiPalma between 2003 and 2008, found only a partial disability. (R. 19.) Although Dr. Katz's

opinion was made very early in the case history, ALJ Katz found:

> that opinion is consistent with the overall medical record, which shows hardly any
> instances when [DiPalma] reported any difficulty whatsoever with "sedentary"
> activities . . . ; in addition, [DiPalma] was able to get to a gym independently to work
> on muscle strengthening.

(R. 19.) In fact, medical records did not show that DiPalma "was measurably restricted from

walking or that he suffered from any symptoms other than a limited range of motion . . . in the right

leg and an antalgic gait." (R. 17.) Moreover, consultative physician Dr. Malhotra noted that

DiPalma "could perform work requiring occasionally lifting or carrying up to twenty pounds, sitting

for seven hours and standing or walking for one hour each during an eight-hour workday, and did

not require the use of a cane or any other assistive device in order to ambulate effectively." (R. 20.)

ALJ Katz concluded:

> Overall, [DiPalma's] treating physicians found no atrophy in [DiPalma's]
> lower extremities despite consistent pain/discomfort in the right knee, suggesting that
> [DiPalma] remained relatively active during the period at issue. He informed Dr.
> Hyman that he frequently takes walks and goes to the gym to lift weights for exercise
> and recreation. [DiPalma] has not required significant medical treatment subsequent
> to calendar year 2005; in addition, has not registered complaints of problems with
> "sitting". [DiPalma] does not take significant pain medication, which gives us some
> indication that the pain he experiences is []at a lesser intensity th[a]n attested to in
> connection with his disability application. Finally, the undersigned notes that
> [DiPalma] recently received a large amount of money in connection with the
> settlement of his claim for Workers' Compensation Benefits and that his motivation
> to return to work is, therefore, not particularly strong.

(R. 20, record citations omitted.)

ALJ Katz applied the appropriate five step legal analysis, as follows: First, ALJ Katz

found that DiPalma had not "engaged in substantial gainful activity during the period from his

alleged onset date of January 6, 2003." (R. 14.) Second, ALJ Katz determined that DiPalma had "severe impairments" of "right knee derangement" and "obesity." (R. 14.) Third, ALJ Katz found that DiPalma "did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments." (R. 14.) ALJ Katz determined that DiPalma retained "the residual functional capacity to perform a full range of exertionally sedentary work" (R. 15), adding that:

> During a typical eight-hour workday on and prior to his date last insured, [DiPalma] was capable of lifting/carrying objects weighing ten pounds at a time, sitting for six hours and walking/standing for a total of four hours.

(R. 21.) Fourth, ALJ Katz determined that DiPalma "was unable to perform any past relevant work." (R. 21.) Further, ALJ Katz found that DiPalma was "46 years old, which classifies him as a younger individual age 45-49, on the date last insured"; DiPalma had "at least a high school education and is able to communicate effectively in English"; and "[t]ransferability of job skills is not material to the determination of disability." (R. 21-22.) At the last step, based on the Grid, ALJ Katz found that "considering [DiPalma's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could have performed." (R. 22.) ALJ Katz concluded that DiPalma was not "under a disability, as defined in the Social Security Act, at any time from January 6, 2003, the alleged onset date, through December 31, 2007, the date last insured." (R. 22.)

On July 12, 2012, the Appeals Council denied DiPalma's request for review of ALJ Katz's decision, which became the Commissioner's final decision. (R. 1-4, 7-8.)

## ANALYSIS

### I. THE APPLICABLE LAW

#### A. Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is

unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart

v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856,

857 (2d Cir. 2012).[2]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)-(B), 1382c(a)(3)(B), (G); see, e.g., Barnhart v. Thomas, 540 U.S. at 23,

124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of

---

[2]   See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[3/]

        In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[4/]

### B.    Standard Of Review

        A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011); Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).[5/] "'Thus, the role of the district court is

---

[3/]    See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[4/]    See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

[5/]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[6]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[7] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[8]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y.

---

[6] See also, e.g., Santiago v. Astrue, 11 Civ. 6873, 2012 WL 1899797 *13 (S.D.N.Y. May 24, 2012) (Peck, M.J.); Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 13, 2003); Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[7] See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[8] See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir.

2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101

(2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

      The Commissioner's regulations set forth a five-step sequence to be used in

evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540

U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct.

2287, 2291 (1987). The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated
> regulations establishing a five-step sequential evaluation process to determine
> disability. If at any step a finding of disability or non-disability can be made, the
> SSA will not review the claim further. [1] At the first step, the agency will find
> nondisability unless the claimant shows that he is not working at a "substantial
> gainful activity." [2] At step two, the SSA will find nondisability unless the claimant
> shows that he has a "severe impairment," defined as "any impairment or combination
> of impairments which significantly limits [the claimant's] physical or mental ability
> to do basic work activities." [3] At step three, the agency determines whether the
> impairment which enabled the claimant to survive step two is on the list of
> impairments presumed severe enough to render one disabled; if so, the claimant
> qualifies. [4] If the claimant's impairment is not on the list, the inquiry proceeds to
> step four, at which the SSA assesses whether the claimant can do his previous work;
> unless he shows that he cannot, he is determined not to be disabled. [5] If the
> claimant survives the fourth stage, the fifth, and final, step requires the SSA to
> consider so-called "vocational factors" (the claimant's age, education, and past work
> experience), and to determine whether the claimant is capable of performing other
> jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted); accord, e.g.,

Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v.

Apfel, 167 F.3d at 774.[2/]

---

[2/]    See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barnhart, 335
F.3d at 106; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v.
Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater,
77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675
(continued...)

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training. See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[10]

## C. The Treating Physician Rule

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); see, e.g., Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).[11]

---

[9] (...continued)
F.2d 464, 467 (2d Cir. 1982).

[10] See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d at 106; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

[11] See also, e.g., Foxman v. Barnhart, 157 F. App'x 344, 346 (2d Cir. 2005); Tavarez v. Barnhart, 124 F. App'x 48, 49 (2d Cir. 2005); Donnelly v. Barnhart, 105 F. App'x 306, 308 (2d Cir. 2004); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Kamerling v. Massanari, 295 F.3d 206, 209 n.5 (2d Cir. 2002); Jordan v. Barnhart, 29 F. App'x 790, 792 (2d Cir. 2002); Bond v. Soc. Sec. Admin., 20 F. App'x 20, 21 (2d Cir. 2001); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. (continued...)

Further, the regulations specify that when controlling weight is not given a treating

physician's opinion (because it is not "well supported" by other medical evidence), the ALJ must

consider the following factors in determining the weight to be given such an opinion: (1) the length

of the treatment relationship and the frequency of examination; (2) the nature and extent of the

treatment relationship; (3) the evidence that supports the treating physician's report; (4) how

consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the

physician in contrast to the condition being treated; and (6) any other factors which may be

significant. 20 C.F.R. § 404.1527(d)(2)-(6); see, e.g., Gunter v. Comm'r of Soc. Sec., 361 F. App'x

197, 197 (2d Cir. 2010); Foxman v. Barnhart, 157 F. App'x at 346-47; Halloran v. Barnhart, 362

F.3d at 32; Shaw v. Chater, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d at 118; Schaal

v. Apfel, 134 F.3d at 503.[12/]

When a treating physician provides a favorable report, the claimant "is entitled to an

express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's]

favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an

explanation of why it does not." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see, e.g., Zabala

v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician

evidence ordinarily requires remand pursuant to Snell but does not require remand where the report

was "essentially duplicative of evidence considered by the ALJ."); Ferraris v. Heckler, 728 F.2d 582,

---

[11/] (...continued)
2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999); Clark v. Comm'r of Soc. Sec.,
143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

[12/] See also, e.g., Kugielska v. Astrue, 06 Civ. 10169, 2007 WL 3052204 at *8 (S.D.N.Y.
Oct. 16, 2007); Hill v. Barnhart, 410 F. Supp. 2d 195, 217 (S.D.N.Y. 2006); Klett v.
Barnhart, 303 F. Supp. 2d 477, 484 (S.D.N.Y. 2004); Rebull v. Massanari, 240 F. Supp. 2d
265, 268 (S.D.N.Y. 2002).

587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by

the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set

forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is

supported by substantial evidence." (citations omitted)); Ramos v. Barnhart, 02 Civ. 3127, 2003 WL

21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician

report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this

Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second

Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

## D. The ALJ's Duty to Develop the Record

It is the "well-established rule in [the Second] circuit" that the ALJ must develop the

record, even where, as here, the claimant was represented by counsel:

> Even when a claimant is represented by counsel, it is the well-established rule
> in our circuit "that the social security ALJ, unlike a judge in a trial, must on behalf
> of all claimants . . . affirmatively develop the record in light of the essentially non-
> adversarial nature of a benefits proceeding." Lamay v. Comm'r of Soc. Sec., 562
> F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks and brackets omitted)
> [cert. denied, 130 S. Ct. 1503 (2010)]; accord Butts v. Barnhart, 388 F.3d 377, 386
> (2d Cir. 2004), reh'g granted in part and denied in part, 416 F.3d 101 (2d Cir. 2005);
> Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996); see also Gold v. Sec'y of Health
> Educ. & Welfare, 463 F.2d 38, 43 (2d Cir. 1972) (pro se claimant). Social Security
> disability determinations are "investigatory, or inquisitorial, rather than adversarial."
> Butts, 388 F.3d at 386 (internal quotation marks omitted). "[I]t is the ALJ's duty to
> investigate and develop the facts and develop the arguments both for and against the
> granting of benefits." Id. (internal quotation marks omitted); accord Tejada v. Apfel,
> 167 F.3d 770, 774 (2d Cir. 1999).

Moran v. Astrue, 569 F.3d 108, 112-13 (2d Cir. 2009).[13/]

---

13/    See also, e.g., 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1512(d), 416.912(d),
       416.912(e)(2); Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008); Perez v. Chater, 77 F.3d
       (continued...)

## II.    APPLICATION OF THE FIVE-STEP SEQUENCE TO DIPALMA'S CLAIM

### A.    DiPalma Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether DiPalma was engaged in substantial gainful activity after

his application for DIB. "Substantial gainful activity" is defined as work that involves "doing

significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit."

20 C.F.R. § 404.1510. ALJ Katz's conclusion that DiPalma did not engage in substantial gainful

activity during the applicable time period (see page ___ above) is not contested by DiPalma or the

Commissioner. (See Dkt. No. 20: DiPalma Reply Br. at 3; see generally Dkt. No. 18: Comm'r Br.;

Dkt. No. 15: DiPalma Br.) The Court therefore proceeds to the second step of the five-step analysis.

### B.    DiPalma Demonstrated "Severe" Impairments That Significantly Limited His Ability To Do Basic Work Activities

The second step of the analysis is to determine whether DiPalma proved that he had

a severe impairment or combination of impairments that "significantly limit[ed his] physical or

mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The ability to do basic work

activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §

404.1521(b). "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling
> . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and
> remembering simple instructions . . . [u]se of judgment . . . [r]esponding
> appropriately to supervision, co-workers and usual work situations . . . [d]ealing with
> changes in a routine work setting.

---

13/    (...continued)
41, 47 (2d Cir. 1996); Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d
Cir. 1982); Torres v. Barnhart, 02 Civ. 9209, 2007 WL 1810238 at *9 (S.D.N.Y. June 25,
2007) (Peck, M.J.) (& cases cited therein).

20 C.F.R. § 404.1521(b)(1)-(6). The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995). "[T]he 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" McDowell v. Colvin, No. 11-CV-1132, 2013 WL 1337132 at *6 (N.D.N.Y. Mar. 11, 2013), report & rec. adopted, 2013 WL 1337131 (N.D.N.Y. Mar. 29, 2013).[14]

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process." Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999). On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken. See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

---

[14] Accord, e.g., Whiting v. Astrue, Civ. Action No. 12-274, 2013 WL 427171 at *2 (N.D.N.Y. Jan. 15, 2013) ("'The mere presence of a disease or impairment alone . . . is insufficient to establish disability; instead, it is the impact of the disease, and in particular any limitations it may impose upon the claimant's ability to perform basic work functions, that is pivotal to the disability inquiry.'"), report & rec. adopted, 2013 WL 427166 (N.D.N.Y. Feb. 4, 2013); Lohnas v. Astrue, No. 09-CV-685, 2011 WL 1260109 at *3 (W.D.N.Y. Mar. 31, 2011), aff'd, No. 11-2383, --- F. App'x ----, 2013 WL 362898 (2d Cir. Jan. 31, 2013); Hahn v. Astrue, 08 Civ. 4261, 2009 WL 1490775 at *7 (S.D.N.Y. May 27, 2009) (Lynch, D.J.) ("[I]t is not sufficient that a plaintiff 'establish[] the mere presence of a disease or impairment.' Rather, 'the disease or impairment must result in severe functional limitations that prevent the claimant from engaging in any substantial gainful activity.'" (citation omitted)); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) ("The mere presence of a disease or impairment is not disabling within the meaning of the Social Security Act.").

ALJ Katz determined that the medical evidence indicated that DiPalma had "severe impairments" of "right knee derangement" and "obesity." (See page 13 above.) Because this finding favors DiPalma and is not contested by the Commissioner (see Dkt. No. 20: DiPalma Reply Br. at 3; see generally Dkt. No. 18: Comm'r Br.), the Court proceeds to the third step of the five-step analysis.

## C. DiPalma Did Not Have A Disability Listed In Appendix 1 Of The Regulations

The third step of the five-step test requires a determination of whether DiPalma had an impairment listed in Appendix 1 of the Regulations. 20 C.F.R., Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Katz found that while DiPalma's medical conditions were "severe," he did "not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 14) ALJ Katz remarked that DiPalma "has not experienced an inability to ambulate effectively," as required by listings 1.02 and 1.03. (R. 14-15.) Appendix 1 provides a categorization of physical impairments, including musculoskeletal disorders. See 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00. DiPalma argues that ALJ Katz "erred when he dismissed the medical evidence finding that the claimant did not meet or equal the listing 1.02 or 1.03." (Dkt. No. 15: DiPalma Br. at 17; see Dkt. No. 20: DiPalma Reply Br. at 3-6.)[15/]

---

[15/]     DiPalma argues that it "is not clear from the ALJ's decision whether he adequately

(continued...)

Section 1.02 outlines the conditions required to establish disorders of the joint. 20

C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02. To constitute an Appendix 1 impairment, DiPalma's right

knee pain must qualify as "[m]ajor dysfunction of a joint(s)," characterized by:

> gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02 (emphasis added).

Under Section 1.03, impairment can also arise from:

> Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.03 (emphasis added).

"Inability [t]o ambulate effectively" means:

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1). "To ambulate effectively,"

> individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the

---

[15] (...continued)
considered this listing." (DiPalma Reply Br. at 4.) In fact, the ALJ's opinion unequivocally stated that "the undersigned has specifically considered listings 1.02 and 1.03." (R. 14.)

inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2).

There is substantial evidence to support ALJ Katz's finding that DiPalma's right knee condition did not meet or medically equal one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1, including § 1.02 and § 1.03, and that DiPalma could "ambulate effectively."

As a house husband, DiPalma testified before the ALJ that he carried out activities of daily living, including cooking for his family, picking up his children from school and driving for thirty to forty-five minutes at a time. (See page 3 above.) In March-April 2005, DiPalma traveled to Mexico. (See page 5 above.) In November 2008, DiPalma told Dr. Hyman that he often walked and weight-lifted for exercise and recreation. (See page 9 above.) Although DiPalma continuously reported right knee pain, Dr. Appel and Dr. Katz both recommended that DiPalma go to the gym (see pages 4, 7 above), an indication of DiPalma's ability to remain active. Although Dr. Appel noted that DiPalma walked with a limp and had an antalgic gait and reported mild arthralgias, DiPalma's neurovascular status, palpation, muscle strength, and range of motion were all normal. (See page 5 above.) Both Dr. Jones and Dr. Malhotra reported that DiPalma could walk on heels and toes without difficulty. (See pages 7, 9 above.) Dr. Malhotra noted that DiPalma used no assistive device and needed no help changing for the exam or getting on and off the exam table. (See page 10 above.) It is undisputed that other than for a short period after surgery, DiPalma used a single cane to walk. (See pages 5, 9 above.)

DiPalma did not prove that his knee impairment impacted his ability to ambulate to the extent required by the Listings. See, e.g., Richardson v. Astrue, 10 Civ. 9356, 2011 WL 2671557 at \*9 (S.D.N.Y. July 8, 2011) (Peck, M.J.) (claimant who took "public transportation without assistance," "climb[ed] stairs," and "perform[ed] various household chores" could ambulate effectively, even though he "walked with a Trendelenburg gait" and "his ability to ambulate was moderately to severely impaired" (quotations omitted)), report & rec. adopted, 2011 WL 3477523 (S.D.N.Y. Aug. 8, 2011); Paulino v. Astrue, 08 Civ. 02813, 2010 WL 3001752 at \*15 (S.D.N.Y. July 30, 2010) (Peck, M.J.) (claimant that "limped slowly [to] avoid[ ] pressure on [her] right ankle and had moderate limitations in walking long distances," could ambulate effectively because she walked "without any assistive device," and was able to climb stairs "to her fourth floor apartment (albeit slowly) and travel by bus and taxi without assistance" (citations & quotations omitted)); Dibiasio v. Astrue, No. 08 CV 0743, 2010 WL 3368429 at \*10 (W.D.N.Y. June 10, 2010) (claimant who "made short trips to the store, performed light household chores like laundry, gardening, vacuuming and meal preparation, and was able to travel short distances without a cane" could ambulate effectively), report & rec. adopted, 2010 WL 3368358 (W.D.N.Y. Aug. 23, 2010); Marullo v. Astrue, No. 08 CV 0818, 2010 WL 2869577 at \*9 (W.D.N.Y. May 4, 2010) (claimant's testimony that she takes "Tylenol for knee pain, has difficulty walking long distances . . . and has to sit when she experiences pain in her legs . . . without more, . . . does not rise to the definition of ineffective ambulation" (citations omitted)), report & rec. adopted, 2010 WL 2869574 (W.D.N.Y. July 20, 2010); Rosado v. Astrue, 713 F. Supp. 2d 347, 360 (S.D.N.Y. 2010) (Peck, M.J.) (claimant who

"had full range of motion in his ankles," "did not require an assistive device to walk," did "his own shopping and [made] social visits to his son's home" was able to ambulate effectively).[16]

Substantial evidence thus supports ALJ Katz's determination that DiPalma did not meet the criteria for disability based on his musculoskeletal disorder under the Listings of Impairments, 20 C.F.R., Pt. 404, Subt. P, App. 1, §§ 1.02 and 1.03.

Before proceeding to step four, the Court will address ALJ Katz's credibility and residual functional capacity determinations.

## 1. Credibility Determination

Because subjective symptoms like pain only lessen a claimant's residual functional capacity where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other

---

[16]    See also, e.g., Serrano v. Astrue, 08 Civ.1920, 2009 WL 959557 at *10 (S.D.N.Y. Mar. 16, 2009) (claimant could ambulate effectively because she "was able to use public transportation, do her own shopping, climb steps to enter and exit her apartment, and walk several blocks, albeit with breaks"); Alcantara v. Astrue, 667 F. Supp. 2d 262, 275 (S.D.N.Y. 2009) (claimant with a "'mild limitation' of her ability to walk" failed to demonstrate her inability to ambulate, because she "was able to walk without difficulty on her heels" and "had a full range of motion"); Guy v. Astrue, 615 F. Supp. 2d 143, 161 (S.D.N.Y. 2009) (although claimant "experienced some discomfort when walking," he could ambulate effectively because he indicated that he was able to walk short distances comfortably with a cane); Munn v. Comm'r of Soc. Sec., No. 06 CV 231, 2008 WL 2242654 at *8 (N.D.N.Y. May 29, 2008) (claimant who was able to complete daily activities independently, such as shopping and socializing with family and friends, dismount the examination table without assistance during appointments, and walk without assistive devices, although she used a cane occasionally, could ambulate effectively).

limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints

without question.' Rather, the ALJ 'may exercise discretion in weighing the credibility of the

claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v.

Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required

to take the claimant's reports of pain and other limitations into account, but is not required to accept

the claimant's subjective complaints without question; he may exercise discretion in weighing the

credibility of the claimant's testimony in light of the other evidence in the record." (citations

omitted)); Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("Where there is

conflicting evidence about a claimant's pain, the ALJ must make credibility findings.").[17]

        ALJ Katz determined that DiPalma's "medically determinable impairments could

reasonably be expected to cause some of the alleged symptoms; however, [DiPalma's] statements

concerning the intensity, persistence and limiting effects of these symptoms are not credible to the

---

[17]  See also, e.g., Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (The ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime and her daily routine."); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Karle v. Astrue, 12 Civ. 3933, 2013 WL 2158474 (S.D.N.Y. May 17, 2013) (Peck, M.J.); Norman v. Astrue, 10 Civ. 5839, --- F. Supp. 2d ----, 2012 WL 4378042 at *46 (S.D.N.Y. Sept. 25, 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (The ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record.); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

extent they are inconsistent with the objective medical evidence." (See page 10 above.) ALJ Katz

noted that although DiPalma "did complain of some pain and some 'clicking'/giving way of the right

knee, [he] described his pain as being a dull ache with only moderate arthralgias." (See page 11

above.) ALJ Katz noted that DiPalma "was consistently found to maintain intact neurological

functioning, deep tendon reflexes and muscle strength." (See page 11 above.) ALJ Katz also noted

that DiPalma "was able to get to a gym independently to work on muscle strengthening." (See page

12 above.) DiPalma's medical records did not show that he "was measurably restricted from

walking or that he suffered from any symptoms other than a limited range of motion" in the right

leg and an antalgic gait. (See page 12 above.) Despite complaining of substantial pain when he

walked or drove for more than forty-five minutes, DiPalma did "not take any medication for relief

of pain - which is [a] major inconsistency." (See page 10 above.)

## 2. **Residual Functional Capacity Determination**

ALJ Katz determined that DiPalma retained "the residual functional capacity to

perform a full range of exertionally sedentary work":

> During a typical eight-hour workday on and prior to his date last insured, [DiPalma]
> was capable of lifting/carrying objects weighing ten pounds at a time, sitting for six
> hours and walking/standing for a total of four hours.

(See page 13 above.) ALJ Katz's assessment that DiPalma is able to perform a full range of

exertionally sedentary work is based on substantial evidence. Although Dr. Appel in September

2003 noted that DiPalma was incapable of doing any type of construction work (see page 4 above),

Dr. Appel did not preclude all employment. Indeed, as ALJ Katz correctly noted, Dr. Appel's

conclusion was in the context of Worker's Compensation, where disability is defined as the inability

to return to past relevant work, i.e., ironwork for DiPalma. (See page 11 above; see also Dkt. No.

20: DiPalma Reply Br. at 9, recognizing the difference in the two disability standards.) See, e.g.,

Gillespie v. Astrue, No. 09-CV-2198, 2012 WL 3646820 at *13 (E.D.N.Y. Aug. 23, 2012) ("Plaintiff's treating physicians opined that he was disabled with regard to workers' compensation. However, those determinations are not dispositive, because the standards for workers' compensation are different than those under the Act."); Rokitka v. Astrue, No. 11-CV-614, 2012 WL 2405197 at *3 (W.D.N.Y. June 25, 2012) ("'[D]isability for purposes of workers' compensation benefits is determined under a different standard than the standard used in the Social Security context[.]'"); Lefever v. Astrue, No. 07-CV-622, 2010 WL 3909487 at *13 (N.D.N.Y. Sept. 30, 2010) ("Workers' compensation determinations are directed to the workers' prior employment and measure the ability to perform that employment rather than using the definition of disability in the Social Security Act. Because disability for purposes of workers' compensation benefits is determined under a different standard than the standard used in the Social Security context, the ALJ is not bound to afford [the treating physician's] finding controlling weight." (citation omitted)), aff'd, 443 F. App'x 608 (2d Cir. 2011); Fortier v. Astrue, 09 Civ. 993, 2010 WL 1506549 at *24 (S.D.N.Y. Apr. 13, 2010) ("[F]indings of disability for workers' compensation purposes are of limited utility for disability purposes under the Social Security Act. Those findings are geared to the person's prior employment and allow findings of partial disability." (quotations omitted)); DeJesus v. Chater, 899 F. Supp. 1171, 1177 (S.D.N.Y. 1995).

Moreover, as ALJ Katz properly found as a matter of law, Dr. Appel, who is not a vocational expert, is not qualified to give a general opinion as to whether DiPalma could return to work. (See page 11 above.) See, e.g., Micheli v. Astrue, No. 11-4756, 2012 WL 5259138 at *2 (2d Cir. Oct. 25, 2012) ("Nevertheless, '[a] treating physician's statement that the claimant is disabled cannot itself be determinative.' It is the Commissioner who is 'responsible for making the determination or decision about whether [the claimant] meet[s] the statutory definition of

disability.'" (citation omitted)); Roma v. Astrue, 468 F. App'x 16, 18 (2d Cir. 2012); Priel v. Astrue, 453 F. App'x 84, 86 (2d Cir. 2011); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("[S]ome kinds of findings—including the ultimate finding of whether a claimant is disabled and cannot work—are 'reserved to the Commissioner.' That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." (citation omitted)); Karle v. Astrue, 12 Civ. 3933, 2013 WL 2158474 at *16 (S.D.N.Y. May 17, 2013) (Peck, M.J.) ("While [the treating physician] stated that '[t]his has been protracted and appears to be a permanent disability' and 'strongly advised [the claimant] to apply to permanent total disability,' the treating physician's opinion on disability is not given any special significance." (citation omitted)).[18]

ALJ Katz also did not give weight to Dr. Hyman's opinion that DiPalma is limited to less than two hours of sitting, standing, or walking and is "capable only of performing a significantly limited range" of sedentary work. (See pages 9, 11 above.) ALJ Katz noted that Dr. Hyman's assessment is inconsistent with his clinical observation that DiPalma had good strength of the right knee without pain to resistance on flexion or extension. (See page 11 above.) Moreover, Dr. Hyman examined DiPalma on only one occasion in 2008. (See page 11 above.)

---

[18] DiPalma also argues that he had muscular atrophy and that the ALJ erred in stating that the treating physicians found no atrophy. (Dkt. No. 15: DiPalma Br. at 10.) DiPalma emphasizes "a plethora of evidence [in the record] specifically noting that there was atrophy of the right thigh." (DiPalma Br. at 10.) DiPalma's counsel, however, failed to provide record cites for the "plethora of evidence" demonstrating DiPalma's atrophy. In fact, a careful reading of the record reveals that muscular atrophy was mentioned only once by Dr. Appel, on April 15, 2005. (See page 6 above.)

Dr. Katz determined that DiPalma could perform desk or sedentary work. (See page 12 above.) Although Dr. Katz examined DiPalma only once in 2003, ALJ Katz found that Dr. Katz's opinion is "consistent with the overall medical record, which shows hardly any instances when [DiPalma] reported any difficulty whatsoever with 'sedentary' activities." (See page 12 above.) Dr. Jones also noted in October 2003 that DiPalma could work as long as he avoided prolonged weight-bearing, squatting, and running. (See page 7 above.) In February 2006, Dr. Jones again stated that DiPalma could work if he could use a cane, had limited weight-bearing, and did not have to run, squat, or climb stairs or ladders. (See page 8 above.) ALJ Katz's determination that DiPalma could perform sedentary work also is consistent with the findings of consultative physician Dr. Malhotra that DiPalma was able to lift up to twenty pounds, sit for seven hours, stand or walk for one hour each during an eight-hour workday. (See page 10 above.)

Accordingly, ALJ Katz's assessment that DiPalma is able to perform a full range of exertionally sedentary work is based on substantial evidence.

**D.    DiPalma Did Not Have The Ability To Perform His Past Work**

The fourth step of the five-step analysis asks whether DiPalma had the residual functional capacity to perform his past relevant work. (See page 17 above.) DiPalma previously worked as an ironworker, requiring heavy exertion. (See page 2 above.) ALJ Katz concluded that DiPalma was "unable to perform any past relevant work." (See page 13 above.) Because this finding favors DiPalma and is not contested by the Commissioner (see generally Dkt. No. 18: Comm'r Br.), the Court proceeds to the fifth and final step of the analysis.

**E.     There Was Sufficient Evidence To Support The ALJ's Finding That DiPalma
        Could Perform "Sedentary" Work In The Economy**

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence

to show the existence of alternative substantial gainful work which exists in the national economy

and which the claimant could perform, considering not only his physical capability, but as well his

age, his education, his experience and his training." Parker v. Harris, 626 F.2d 225, 231 (2d Cir.

1980).[19]

> In meeting his burden under the fifth step, the Commissioner:
>
> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404,
> Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account
> the claimant's residual functional capacity in conjunction with the claimant's age,
> education and work experience. Based on these factors, the Grid indicates whether
> the claimant can engage in any other substantial gainful work which exists in the
> national economy. Generally the result listed in the Grid is dispositive on the issue
> of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v.

Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the

promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x

87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir.

1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986). "The Grid classifies work into five

categories based on the exertional requirements of the different jobs. Specifically, it divides work

into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the

primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling."

---

[19]     See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc.
         Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir.
         2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Curry v. Apfel, 209 F.3d
         117, 122-23 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

Zorilla v. Chater, 915 F. Supp. at 667 n.2; see 20 C.F.R. § 404.1567. Taking account of the claimant's residual functional capacity, age, education, and prior work experience, the Grid yields a decision of "disabled" or "not disabled." 20 C.F.R. § 404.1569; 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(a).

However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations." Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); see also, e.g., Travers v. Astrue, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov. 2, 2011) (Peck, M.J.), report & rec. adopted, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); Lomax v. Comm'r of Soc. Sec., No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at 605); see also, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."); Rosa v. Callahan, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.' Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting & citing Bapp)); Suarez v. Comm'r of Soc. Sec., No. 09-CV-338, 2010 WL 3322536 at *9

(E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting Zabala)).[20]

ALJ Katz found that a person of DiPalma's age (forty-six years old), education level (GED), work experience, with the ability to perform sedentary work,[21] is not disabled for the purposes of Social Security benefits. (See page 13 above.) Based on his consideration of the record, ALJ Katz determined that during the period at issue, DiPalma "was capable of lifting/carrying heavy objects weighing ten pounds at a time, sitting for six hours and walking/standing for a total of four hours" during an eight-hour workday. (See page 13 above.) ALJ Katz's assessment is supported by substantial evidence based on testimony of medical experts, including Dr. Katz, Dr. Jones, and Dr. Malhotra. Dr. Katz and Dr. Jones observed that DiPalma had only a partial disability and could

---

[20]    Although the Grid is not dispositive in such cases, it still provides a framework to guide the ALJ's decision. See, e.g., Travers v. Astrue, 2011 WL 5314402 at *10 n.18; Jones v. Astrue, 09 Civ. 5577, 2011 WL 3423771 at *12 (S.D.N.Y. July 15, 2011) (The Grid "serve[s] as a 'framework' for determining whether a claimant with a nonexertional limitation is disabled."), report & rec. adopted, 2012 WL 4473258 (S.D.N.Y. Sept. 28, 2012); Clobridge v. Astrue, No. 07-CV-00691, 2010 WL 3909500 at *11 (N.D.N.Y. Sept. 30, 2010) ("If a plaintiff's situation fits well within a particular classification, then resort to the grids is appropriate. If, on the other hand, nonexertional impairments, including pain, significantly limit the range of work permitted by exertional limitations, then use of the grids is inappropriate, in which case further evidence and/or testimony is required. In such cases, the ALJ may rely on the grids only as a framework for decision-making." (citations omitted)); Paulino v. Astrue, 08 Civ. 02813, 2010 WL 3001752 at *26 (S.D.N.Y. July 30, 2010) (Peck, M.J.) ("While the Grid is not dispositive in cases where the claimant has nonexertional limits . . . , the Grid certainly serves as a framework to guide the ALJ's decision.").

[21]    Sedentary work entails "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). Sedentary work also generally involves "standing or walking . . . no more than about 2 hours of an 8-hour workday, and sitting . . . approximately 6 hours of an 8-hour workday." SSR 83-0, 1983 WL 31251 (1983); see also, e.g., Rosa v. Callahan, 168 F.3d at 78 n.3 (quoting Perez v. Chater, 77 F.3d at 46).

return to sedentary work activities. (See page 12 above.) Dr. Malhotra noted that DiPalma could carry up to twenty pounds, sit for seven hours, and stand or walk for one hour each during an eight-hour workday. (See page 10 above.) ALJ Katz also noted that DiPalma barely reported any difficulty with sedentary activities to his treating physicians. (See page 12 above.)

DiPalma argues that ALJ Katz erred in failing to obtain testimony from a vocational expert. (Dkt. No. 15: DiPalma Br. at 24-25.) Because ALJ Katz considered but discredited DiPalma's claims of pain, DiPalma's right knee pain did not amount to a non-exertional impairment that significantly limited his capacity to perform sedentary work, and thus ALJ Katz was not required to obtain a vocational expert consultation but could utilize the Grid. See, e.g., Brown v. Astrue, No. 12-cv-243, 2013 WL 310292 at *5 (N.D.N.Y. Jan. 25, 2013) ("While [plaintiff] suffers from traumatic brain injury and neck pain, the medical assessments and clinical findings demonstrate a mild overall presentation and significant improvement sufficient to support the ALJ's determination" that plaintiff did not have any nonexertional limitations.); Pease v. Astrue, No. 06-CV-0264, 2008 WL 4371779 at *12-13 (N.D.N.Y. Sep. 17, 2008) (because the claimant who has pain, depression, and drowsiness can "attend to all personal and daily living needs independently and . . . prepare meals and care for his children" and his "medical records are devoid of any reference to any nonexertional limitations or restrictions," a vocational expert was not necessary (quotations omitted)); Crawford v. Bowen, 687 F.Supp. 99, 105 (S.D.N.Y. 1988) ("[A]lthough the record demonstrates numerous instances where plaintiff complained of chest pains to his doctors, almost all of the references to chest pain indicated that the pain was exertional in nature," and "there was no evidence that these symptoms would interfere with plaintiff's ability to perform a wide range of sedentary work."); Rodriguez v. Apfel, 96 Civ. 8330, 1998 WL 150981 at *10 (S.D.N.Y. Mar. 31, 1988) ("[C]laims of pain due to the plaintiff's headaches and her dizziness . . . did not

'significantly diminish' her work capacity such that she could not perform the full range of sedentary employment as indicated by the grids. Hence, there was no need to call a vocational expert.").

## CONCLUSION

For the reasons discussed above, the Commissioner's determination that DiPalma was not disabled within the meaning of the Social Security Act during the period January 6, 2003 to August 24, 2010 is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. No. 17) is GRANTED and DiPalma's motion for judgment on the pleadings (Dkt. Nos. 14, 19) is DENIED.

SO ORDERED

Dated:     New York, New York
           June 28, 2013

**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to: All Counsel